UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
UNITED STATES OF AMERICA,

– against –                                        No. 26-cr-44 (RER)

YEHUDA RINGEL,

Defendant.
----------------------------------------------------------------------x

**DEFENDANT YEHUDA RINGEL'S SENTENCING MEMORANDUM**

**MEISTER SEELIG & SCHUSTER PLLC**
***Counsel for Yehuda Ringel***
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. THE APPLICABLE GUIDELINES IN § 2G2.2 ARE A POOR MEASURE OF CULPABILITY: BOTH COURTS AND THE U.S. SENTENCING COMMISSION ITSELF HAVE RESOUNDINGLY CRIICIZED THIS GUIDELINE FOR DECADES.. 4

III. AS A CHILD YEHUDA SUFFERED DAILY ABUSE AT THE HANDS OF HIS FATHER AND TEACHERS; HE HAS WORKED HARD AS AN ADULT TO OVERCOME HIS CHILDHOOD ABUSE AND BUILD STABILITY FOR HIS OWN FAMILY .......... 9

A. Yehuda's Father Mercilessly Emotionally Abused Him .......... 11

1. *Yehuda's Father Used His Learning Disability as an Excuse to Pick on Him* .......... 11

2. *Yehuda's Appearance Was a Further Excuse For His Father's Ridicule* 13

3. *Yehuda's Father Embraced his Neighbor's Children While Conspicuously Shunning Yehuda* .......... 15

4. *Yehuda's Father Found Every Opportunity to Inflict Anguish* .......... 16

B. Yehuda was Banished From Home at 12 Years Old and Sent to a School Where Staff Bullied Him .......... 18

C. As An Adult, Yehuda Has Worked Hard To Move Beyond His Childhood, And Build A Life As A Productive Member Of Society .......... 21

1. *Yehuda Sought Therapy To Deal With The Years of Abuse He Endured* . 21

2. *Yehuda Is A Superlative Father, Providing His Children With The Fatherly Love and Security He Never Had* .......... 22

3. *Yehuda is a Thoughtful and Supportive Husband; His Wife Bat Sheva Relies on Him to Make her Life Work* .......... 25

4. *Yehuda Built A Successful Business, and was The Primary Financial Support For His Family at Home in Israel* .......... 26

IV. THE LAST YEAR SINCE YEHUDA'S ARREST HAVE DISLOCATED HIS FAMILY FROM THEIR LIVES IN ISRAEL, AND BROUGHT FRESH TRAUMA ON YEHUDA AND HIS YOUNG SONS .......... 28

A. Yehuda Was Mercilessly Bullied at the MDC; Neither Guards Nor Other Inmates Protected Him .......... 29

B. The Children Have Not Fully Overcome The Five Months of Separation They Endured When Yehuda Was Incarcerated at the MDC .......... 31

C. Yehuda's Children Have Struggled Over The Last Year Away From Home ...... 34

D. Yehuda and His Wife Have Also Struggled Since His Arrest—Living Two Continents Away From Their Home During the Pendency of This Case Has Taken a Real Toll On Their Lives and Careers ................................................... 35

E. Yehuda's Father Passed Away Recently While Yehuda was On Bail In the United States, Preventing Him From Mourning With His Extended Family................... 38

V. A CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE THE TWIN AIMS OF FEDERAL SENTENCING: DETERRENCE AND REHABILITATION ...................... 39

A. Yehuda is Deeply Sorry for his Crime.................................................................. 40

B. Yehuda is an Israeli National With Few Connections to the United States: He Does Not Live Here, and the Crux of His Crime Was Not Committed Here, Reducing the Deterrence Value of A Long Custodial Sentence........................... 43

C. Comparable Cases Result In a Statutory Maximum Sentence of One Year in Mr. Ringel's Home Country; A Further Basis To Impose a Time-Served Sentence .. 45

VI. CONCLUSION......................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Gall v. United States*,
552 U.S. 38 (2007) ........ 3

*Padilla v. Kentucky*,
559 U.S. 356 (2010) ........ 44

*Peugh v. United States*,
569 U.S. 530 (2013) ........ 3

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........ 3

*United States v. Bannister*,
786 F. Supp. 2d 617 (E.D.N.Y. 2011) ........ 42

*United States v. Chin Chong*,
No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) ........ 44

*United States v. Davis*,
905 F.2d 245 (9th Cir. 1990) ........ 43

*United States v. Dorvee*,
616 F.3d 174 (2d Cir. 2010) ........ 4, 5, 6, 7, 8, 9

*United States v. Eiflaar*,
255 F. Supp. 3d 394 (E.D.N.Y. 2017) ........ 45

*United States v. Fanfair*,
379 F. Supp. 3d 138 (E.D.N.Y. 2019) ........ 44, 45

*United States v. Ferreira*,
No. 20-CR-229 (MKB) (E.D.N.Y. 2022) ........ 7, 8

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........ 3, 9, 10

*United States v. Jenkins*,
854 F.3d 181 (2d Cir. 2017) ........ 4, 5, 6, 7

*United States v. Mule*,
No. 14-CR-269 (NGG) (E.D.N.Y. 2015) ........ 8

*United States v. Mughal*,
No. 20-CR-488 (NGG) (E.D.N.Y. 2022) .......... 8

*United States v. Shafer*,
No. 18-CR-569 (AMD) (E.D.N.Y. 2022).......... 8

*United States v. Soto*,
No. 17-CR-539 (ERK) (E.D.N.Y. 2018).......... 8

*United States v. Stern*,
590 F. Supp. 2d 945 (N.D. Ohio 2008) .......... 6

*United States v. Tisdale*,
No. 10-CR-640 (RJD) (E.D.N.Y. 2012).......... 8

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) .......... 43

**Statutes**

18 U.S.C. § 2252(a)(4)(B) .......... 1, 8, 42, 45

18 U.S.C. § 3553.......... 1, 3, 9, 39, 42, 46

**Rules**

U.S.S.G. § 2G2.2 .......... 4, 5, 6, 7, 8, 9, 45

# EXHIBIT LIST

| |
|---|
| **Exhibit A – Yehuda Ringel Letter (English and Hebrew)** |
| **Exhibit B – Letters from Family and Friends** |
| Shmuel Friedman (English and Hebrew) |
| Bat Sheva Ringel (English and Hebrew) |
| Chaya Ringel (English) |
| Pinchas Ringel (English) |
| Yaacov Dov Ringel (English and Hebrew) |
| Yosef Ringel (English and Hebrew) |
| Malka Schwartz (English and Hebrew) |
| Shmuel Yoskovitz (English and Hebrew) |
| Itzchak Zilberberg (English and Hebrew) |
| Esther Zryl (English and Hebrew) |
| **Exhibit C - United States Sentencing Guidelines Variance Rates** |

Defendant Yehuda Ringel respectfully submits this sentencing memorandum in support of his request for a time-served sentence.

## I. INTRODUCTION

The federal sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Only a time served sentence can satisfy that directive for Yehuda Ringel.

On May 9, 2025, Mr. Ringel attempted to enter the United States as a tourist. He traveled here with his family from Israel to attend his brother's wedding. While going through customs, Mr. Ringel was arrested for possession of child pornography under 18 U.S.C. § 2252(a)(4)(B). He was detained at the MDC for nearly five months, and spent the last year since his release away from his home in Israel. There are no allegations that Mr. Ringel engaged in any conduct involving improper contact with a child. He did not solicit a child, entice, produce or distribute child pornography, or otherwise improperly engage with any children—not in the United States, and not in his home country of Israel. There is no evidence that Mr. Ringel personally is a danger to any child at all. To the contrary, throughout his yearlong period of release on bond, Pretrial Services has permitted Yehuda to live with and care for his young children.

And indeed, other than the charged conduct here, Mr. Ringel has led a blameless life in Israel. He has no criminal record in Israel (or anywhere else). He has focused his life on working hard in small catering business he built in Israel, supporting his family, and providing superlative care to his two small children. But on the day of his arrest at JFK, everything stopped. He was taken from his children, and detained at the MDC for nearly five months during which he was tormented by other inmates—as a small stature professional chef who spoke almost no English, Mr. Ringel was an easy target. And the MDC guards were slow to intervene, even letting Yehuda get slashed by another inmate wielding a razor while they stood close by.

Yehuda's personal suffering, however, was nothing compared to the pain of watching his children struggle because of his actions in this case. At the ages of two and five, they were summarily separated from their father. Prior to his arrest, Yehuda was a very involved father: he cared for the children's morning routines, and was often home for bedtime. He made sure to take them for special activities. It was of the primary importance to Yehuda that his children felt instinctively that they could rely on him. After his arrest, though, it was as if he vanished. They spent months without him, not understanding what happened, but feeling the void of their father's absence in their daily lives back home in Israel.

Thankfully, approximately a year ago, the family was reunited when Yehuda was released on bond. But Yehuda's family continued to struggle. When his wife and children moved to the United States so they could all be together they were out of their element. They did not speak the language. They could not work. The children left their schools, their friends, and their routines. While anything was better than the separation they endure, the dislocation has been a daily struggle for Yehuda, his wife, and his children.

Yehuda has internalized the painful consequences of his actions, and the impact they have had on his entire family. That was too much for him to bear. Indeed, Yehuda knows how important a father's love and calming presence can be for family stability. Yehuda grew up without a shred of warmth or care from his own father who spent years singling Yehuda out for emotional abuse and ridicule, before banishing Yehuda to a harsh religious boarding school at the age of 12. Yehuda's learning disabilities, his physical appearance, and even just his gifts as a joyful singer were excuses for his father's wrath. Yehuda's father would lash out at him, lock Yehuda in his room, and publicly taunt Yehuda for his trouble reading. Yehuda's siblings describe his childhood experiences starkly: "Yehuda has gone through hell." Ex. B, Pinchas Ringel Ltr. at 3.

In the last year since his arrest, Yehuda has committed himself to upholding his solemn "responsibility to protect [his children], teach them, and create a safe and protected environment for them." Ex. A, Yehuda Ringel Ltr. at 1. Watching his family struggle this last year has been a daily reminder for Yehuda "that the price of my actions was not mine alone. My wife, my children . . . have carried a heavy burden with me;" and "[s]eeing their pain has made me understand that my responsibility as a father is not limited to loving and providing for them; it also includes the choices I make and the sense of safety I create around them." *Id.* He has worked with a therapist to understand the broader consequences of his crime in jeopardizing children, and to strengthen his tools for self-regulation. Yehuda is committed to "demonstrate[ing] through my actions that I have learned from this period," and awaits his "chance to build from it a better, safer, and more responsible future" for his children, his wife, and himself. *Id.* at 3.

These realities of Yehuda's life, and his commitment to rehabilitation should be central to the Court's crafting a just sentence. While the Court's sentencing analysis must begin "by correctly calculating" the applicable advisory Sentencing Guidelines range, that calculation, in this case 78 to 97 months imprisonment, is but one relevant element. *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). At sentencing, "the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012). Given the painful lessons Yehuda has already learned from enduring harsh incarceration, and helplessly watching his family suffer, the Guidelines vastly overstate a just and reasonable sentence. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing,

when his very future hangs in the balance."). A time served sentence is sufficient but not greater than necessary for Yehuda Ringel.

## II. THE APPLICABLE GUIDELINES IN § 2G2.2 ARE A POOR MEASURE OF CULPABILITY: BOTH COURTS AND THE U.S. SENTENCING COMMISSION ITSELF HAVE RESOUNDINGLY CRIICIZED THIS GUIDELINE FOR DECADES

Per Mr. Ringel's plea agreement, and in accordance with the PSR, Mr. Ringel's advisory Guidelines are calculated under U.S.S.G. § 2G2.2. They provide for an adjusted offense level of 28, corresponding to between 78 and 97 months' imprisonment at a criminal history category I. *See* Plea at ¶ 2; PSR ¶¶ 36-54; 92. That Guideline calculation is largely driven by four enhancements, represent an increase of 13 levels as follows:

- +2 levels under § 2G2.2(b)(2), applying to material involved a prepubescent minor;
- +4 levels under § 2G2.2(b)(4), applying to "material that portrays" either "sadistic or masochistic conduct" or "sexual abuse and exploitation of an infant or toddler";
- + 2 levels under § 2G2.2(b)(6) for "use of a computer"; and
- + 5 levels under § 2G2.2(b)(7)(D) for involving "600 or more images."

*See* Plea at ¶ 2; PSR ¶¶ 36-48.

These same enhancements are applied, essentially by rote, in well-over 50% of sentences under § 2G2.2, removing their utility as a measure of Mr. Ringel's personal culpability. More than 15 years ago, in *United States v. Dorvee*, the Second Circuit excoriated the § 2G2.2 Guideline for precisely this reason: because "many of the § 2G2.2 enhancements apply in nearly all cases,"— including the four applicable to Mr. Ringel's Guideline calculation. *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010). Specifically, *Dorvee* explained that:

> Of all sentences under § 2G2.2 . . . 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms

> of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)).

*Id.*; *accord United States v. Jenkins*, 854 F.3d 181, 189 (2d Cir. 2017) (vacating § 2G2.2 sentence as unreasonable: "The concerns we expressed in *Dorvee* apply with even more force here and none of them appears to have been considered by the district court. Jenkins received precisely the same run-of-the-mill and all-but-inherent enhancements that we criticized in *Dorvee*, resulting in an increase in his offense level" by 13-levels) (quotation marks and citations omitted).

The fundamental flaws the Second Circuit recognized in *Dorvee* have yet to be fixed. If anything, technological changes making cellular telephones (qualifying for a computer enhancement under § 2G2.2(b)(6)) more prevalent, and large volumes of images easier to possess and receive, have only exacerbated the Second Circuit's concerns identified in *Dorvee*. In a recent report, the Sentencing Commission explained as much:

> [A]s a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability. Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the Internet. ***As a result, four of the of six sentencing enhancements in §2G2.2 — those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels — now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability***. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

U.S. Sentencing Guidelines Commission, *Federal Child Pornography Offenses*, at ii-iii (2021) (footnotes omitted) (emphasis added).[1] So too, in 2017, the Second Circuit in *Jenkins* identified § 2G2.2's approach to enhancements as "outdated," in holding that "§ 2G2.2 cannot bear the weight assigned it because the cumulation of repetitive, all-but-inherent, enhancements yielded, . . . a Guideline range that failed to distinguish between [a low level offender's] conduct and other offenders whose conduct was far worse." *Jenkins*, 854 F.3d at 190.

Of course, enhancements that apply in all or most cases lose their utility in approximating individual culpability, or distinguishing between more and less culpable defendants. For that reason, in *Dorvee* the Second Circuit denounced the § 2G2.2 Guideline as "result[ing] in virtually no distinction between the sentences for [lower-level] defendants . . . and the sentences for the most dangerous offenders," because the enhancements applicable in Mr. Ringel's case are applicable in most cases. *Dorvee*, 616 F.3d at 187. In § 2G2.2 cases, courts are thus "left without a meaningful baseline from which they can apply sentencing principles" in non-production cases like Mr. Ringel's. *United States v. Stern*, 590 F. Supp. 2d 945, 961 (N.D. Ohio 2008).[2]

---

[1] Available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

[2] The § 2G2.2 Guideline is also inherently flawed for another reason: it was not developed through the Sentencing Commission's "empirical approach based on data about past sentencing practice. . . . Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties," and "[t]he Commission has often openly opposed these Congressionally directed changes," which have resulted in the present Guideline. *Id.* at 184-85. As far back as 1991, the Sentencing Commission "wrote to the House of Representatives" to oppose the enhancements under consideration by Congress, which were eventually statutorily placed in the § 2G2.2 Guideline "stating that the proposed Congressional action would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness." *Id.* at 185; *accord id.* at 186 ("In 1996, the Commission criticized the two-level computer enhancement (which is currently set forth at § 2G2.2(b)(6) and was adopted pursuant to statutory direction) on the ground that it fails to distinguish serious commercial

Sentences imposed since *Dorvee* under § 2G2.2 provide a stark reflection of the ineffectiveness of the § 2G2.2 Guideline in providing a starting point for measuring culpability. In the Second Circuit between 2015 and 2025, more than 75% of all § 2G2.2 sentences varied from the applicable Guidelines range. *See* Ex. C at 1.[3] Within this District, the variance rates are higher yet—in most years more than 80% of sentences varied from the Guidelines, and in some years 100% of cases did. *See* Ex. C at 2. As the Second Circuit instructed, particularly in cases involving the § 2G2.2—an irrational and unsupported Guideline—the district court "may not presume that a Guidelines sentence is reasonable for any particular defendant." *Dorvee*, 616 F.3d at 182. Instead, "[d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2—ones that can range from non-custodial sentences to the statutory maximum—bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188.

Indeed, in this jurisdiction, recent cases of time-served, or dramatic downward variances abound in strictly-possession cases like Mr. Ringel's that do not involve allegations of the defendant touching or harming children, or personally producing child pornography. *See, e.g., United States v. Ferreira*, No. 20-cr-229 (MKB) (E.D.N.Y.) (defendant received a sentence of

---

distributors of online pornography from more run-of-the-mill users."); *Jenkins*, 854 F.3d at 190 (because "the Commission has effectively disavowed § 2G2.2 . . . it should be clearer to a district court . . . that this Guideline can easily generate unreasonable results") (quotation marks and citations omitted). Nonetheless, those same enhancements dramatically increase Mr. Ringel's advisory sentencing Guidelines here.

[3] Exhibit C is an excerpt of the U.S. Sentencing Commission's Interactive Data Analyzer, available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard. Exhibit C, page 1 reflects the variance rate between 2015 and 20025 for § 2G2.2 sentences imposed within the Second Circuit on defendants who, like Mr. Ringel, are in criminal history category I. Exhibit C, page 2 reflects the variance rate between 2015 and 20025 for § 2G2.2 sentences imposed within the E.D.N.Y. on defendants who, like Mr. Ringel, are in criminal history category I.

time-served following a conviction under 18 U.S.C. § 2252(a)(4)(B) for possessing child pornography); *United States v. Mughal*, No. 20-cr-488 (NGG) (E.D.N.Y.) (defendant received a sentence of time-served following a conviction under 18 U.S.C. § 2252(a)(4)(B) for possessing child pornography); *United States v. Soto*, No. 17-cr-539 (ERK) (E.D.N.Y.) (defendant received a sentence of time-served following a conviction under 18 U.S.C. § 2252(a)(4)(B) for possessing child pornography); *United States v. Mule*, No. 14-cr-269 (NGG) (E.D.N.Y.) (defendant received a sentence of time-served following a conviction under 18 U.S.C. § 2252(a)(4)(B) for possessing child pornography); *see also United States v. Schafer*, No. 18-cr-569 (AMD) (E.D.N.Y.) (the defendant received a sentence of 18 months' imprisonment following a conviction under 18 U.S.C. § 2252(a)(4)(B) for possessing child pornography); *United States v. Tisdale*, No. 10-cr-640 (RJD) (E.D.N.Y.) (defendant received a sentence of 18 months' imprisonment following a conviction under 18 U.S.C. § 2252(a)(4)(B) for possessing child pornography).[4]

It is for this same reason that Probation recommended a downward variance of less than half of the bottom of Mr. Ringel's advisory Guidelines range based on *Dorvee*'s reasoning:

> [T]he Probation Office has cited *United States v. Dorvee* in the presentence report, wherein the Second Circuit found USSG §2G2.2 to be "fundamentally different" from other guidelines. This is in large part due to various provisions within the Guideline that were incorporated by congressional mandates. This has led to several of its Specific Offense Characteristics applying in the vast majority of cases, and moreover, undue weight being given to some of those provisions. . . . . Furthermore, because a number of these Specific Offense Characteristics are applied in the vast majority of cases, USSG §2G2.2, in part, fails to adequately distinguish among

[4] Importantly, too, because there is not evidence that Yehuda sent any of the images he possessed, he is less culpable than the vast majority of defendants sentenced under the § 2G2.2 Guideline. In its 2021 report, the Sentencing Commission detailed that: "The Commission's special research project of 1,654 fiscal year 2010 §2G2.2 cases found that nearly two-thirds of offenders (65.4%) distributed child pornography to others. The most common manner of distribution was a P2P file-sharing program." U.S. Sentencing Guidelines Commission, *Federal Child Pornography Offenses*, at viii (2021), available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

> defendants who are convicted of child pornography offenses. *Dorvee* cautions that "unless applied with great care, [USSG §2G2.2] can lead to unreasonable sentences" that are inconsistent with the mandates of 18 U.S.C. § 3553.

Probation Sentencing Rec. at 2-3; *accord* PSR ¶ 15 ("The instant offense requires the application of USSG §2G2.2. Although the Court is required to calculate and consider the guidelines, *in United States v. Dorvee*, 616 F.3d 174 (2nd Cir. 2010), the Second Circuit found USSG §2G2.2 to be 'fundamentally different,' and that, 'unless applied with great care, can lead to unreasonable sentences' that are inconsistent with the mandates of 18 U.S.C. § 3553. This may be a mitigating factor for Your Honor to consider at sentencing.").

But Probation's recommendation did not fully consider Mr. Ringel's other mitigating factors under 18 U.S.C. § 3553(a), which also weigh in favor of a below-Guidelines sentence. *See infra* §§ III, IV, IV. In justifying its below-Guidelines recommendation, Probation did briefly opine that "with respect to the defendant's personal history and characteristics, the Probation Office appreciates the mitigation previously addressed above and in the presentence report and has factored that into its sentence recommendation." *See* Probation Sentencing Rec. at 3. Still, an earnest weighing of Mr. Ringel's harrowing childhood, sincere introspection, and real progress towards rehabilitation warrants a non-custodial sentence.

## III. AS A CHILD YEHUDA SUFFERED DAILY ABUSE AT THE HANDS OF HIS FATHER AND TEACHERS; HE HAS WORKED HARD AS AN ADULT TO OVERCOME HIS CHILDHOOD ABUSE AND BUILD STABILITY FOR HIS OWN FAMILY

The first statutory factor that the Court is instructed to consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). "The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a

defendant's character in imposing sentence." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

Yehuda Ringel was the different kid in his family. He suffered from a learning disability. He acted out. He did not look like his siblings. And instead of protecting him, helping him overcome his disabilities, and navigate the world as a child who was different, Yehuda's father tormented him. His father would take out his wrath on Yehuda: yell at him, lock him in a room, shame him for eating, compare him unfavorably to other children, and play mind games on him often letting Yehuda believe as a young boy that he was lost or abandoned. When he was just 12, Yehuda's father sent him away to a harsh religious boarding school. The teachers and administrators picked on him there too, often singling him out for extra scrutiny and punishment because he was different. Yehuda's siblings describe his early life as "marked by severe pain, emotional trauma, and moments of profound darkness." Ex. B, Pinchas Ringel Ltr. at 1.

But Yehuda never wanted his childhood to define him. He sought help. He went to therapy. "[H]e chose not to give up, not to let go — but to rise. Yehuda could have taken every excuse to fall. Instead, he became extraordinary." *Id*. at 1. He is an extraordinary father, as a primary caregiver for his two young sons: he takes them to school, sings to them, prepares their dinner, reads them books, and prioritizes quality time with them every day. Before his arrest and dislocation from his home in Israel, Yehuda was also an extraordinarily hard working small business owner: he built a catering business from scratch, and became the primary financial support for his family. And he was an extraordinary employer. He was kind to his employees, treated them fairly, and turned their mistakes into opportunities to grow. He has bestowed grace on others, that he was seldom shown.

Yehuda Ringel suffered tremendously in his young life. But he has worked since to build a productive life for himself and his family—and he continues to strive mightily towards that goal. The arc of Mr. Ringel's life provides a strong basis for a time-served sentence.

### A. Yehuda's Father Mercilessly Emotionally Abused Him

Throughout his childhood, Yehuda's father inflicted unceasing abuse on Yehuda. Although Yehuda's father suffered from mental illness, and lashed out broadly, he singled Yehuda out as the particular object of frequent scorn. *See* Ex. B, Esther Zryl Ltr. at 1 ("Yehuda is the eighth of nine siblings. He grew up amid tension and instability, with a father who suffers from mental illness and often targeted him because he was overweight and had learning disabilities."). Yehuda's sister, Malka Schwartz, describes her father as "not a healthy man" who suffered "from mental struggles: depression, anxiety, and a split personality"—more often than not, Yehuda saw only the wrong side of his father's "split personality." Ex. B, Malka Schwartz Ltr. at 1. His father "targeted" Yehuda "because he was overweight and had learning disabilities." Ex. B, Esther Zryl Ltr. at 1.

When he was banished from home at 12 to study at a religious boarding school two hours away, things only got worse for Yehuda. The teacher and student-body supervisor at school picked on Yehuda, doling out harsh and arbitrary discipline. Yehuda, who was a weak student, and socially awkward, was an easy target. His childhood was an endless barrage of taunts, and emotional torture—first, from his father, and then from his teachers.

#### 1. *Yehuda's Father Used His Learning Disability as an Excuse to Pick on Him*

As a child, Yehuda suffered from a severe learning disabilities. "Yehuda struggled badly with reading and couldn't keep pace with the rest of the class." Ex. B, Malka Schwartz Ltr. at 2. He "also had severe attention-deficit issues that were never professionally diagnosed, so he spent

many hours outside the classroom because he didn't take part in lessons or answer questions." *Id*. Those disabilities both led to social isolation from his peers, and gave his father a pretext to deride Yehuda.

Yehuda's older sister Malka describes her father's "hostile and violent treatment" of Yehuda, explaining that Yehuda's father "disliked him because of his learning challenges . . ., and he constantly received remarks and even ongoing neglect." *Id*. Malka recounts a frequent scene at their home as children:

> Father liked drawing negative attention at family meals by shaming Yehuda in front of everyone. He would make him stand and read aloud from an old book with no vowel marks [indicating Hebrew pronunciation]. Yehuda who struggled with reading, had to continue, and at every mistake Father laughed and drew the other children in to laugh with him.

*Id*. at 1.

That was not all. "[E]very Shabbat, [their] father would deliberately choose Yehuda to read the Torah portion at the table — even though he struggled with fluent reading — only to interrupt him constantly, correct his pronunciation, and humiliate him in front of everyone. Imagine how crushing that was for a child already aching inside." Ex. B, Pinchas Ringel Ltr. at 2. Yehuda's brother Yosef similarly describes that their "Father saw Yehuda as a failure compared with boys his age. He made Yehuda read newspaper stories aloud, laughed at every reading mistake, and said, 'That never happens to the neighbor your age.'" Ex. B, Yosef Ringel Ltr. at 1; *accord* Ex. B, Esther Zryl Ltr. at 2 ("When Father went to prayer he forced Yehuda to come with him, leaned on Yehuda's shoulders while groaning as though in pain, and scolded Yehuda for not matching his pace. For a child the scene was horrifying"). For Yehuda's father, his learning disability was not a reason to provide his son with additional support, but a basis for continual ridicule.

### **2**. ***Yehuda's Appearance Was a Further Excuse For His Father's Ridicule***

Yehuda was overweight as a child, a fact his father used as yet another excuse for Yehuda's torment. Whenever Yehuda ate at home, his father harangued him about his weight. "Each time Yehuda ate something [his] Father shouted, 'Enough, you are fat enough already.'" Ex. B, Yosef Ringel Ltr. at 1. Their "Father couldn't stand watching Yehuda eat, he laughed at him and sometimes took food from his plate." Ex. B, Esther Zryl Ltr. at 2. Frequently, "Yehuda . . . asked for an extra serving of food and Father wouldn't allow it to be brought to him." Ex. B, Malka Schwartz Ltr. at 2. To escape his father's wrath, Yehuda would slink away to eat in secret when he was hungry as a child. *Id.* (Yehuda would sneak into "the kitchen and [eat] there, another portion"). But often, their "Father followed him, discovered he had gone to the kitchen to eat, laughed at him loudly, and, in the worst case, slapped him." *Id*.

Family meals on Sabbath and holidays were a nightmare for Yehuda. He knew he would be hectored by his father every time he ate. "Every Friday afternoon," before the Sabbath, "Yehuda would try to grab a quick bite . . . after not having eaten all day. Our father would publicly shame him, calling him a 'fat pig.'" Ex. B, Pinchas Ringel Ltr. at 2. His brother "saw Yehuda's pain week after week. He'd walk away, shoulders slumped, holding back tears." *Id*. "At Shabbat and holiday meals, father would make fun of him that he would eat a lot and with no manners. He would compare him unfavorably to other children his age and demand that he behave like them. He also frequently shouted at him and punished him." Ex. B, Yakov Ringel Ltr. at 1. "If anything spilled at the table, Yehuda was the first to get a slap, even before Father checked who was to blame." Ex. B, Yosef Ringel Ltr. at 1.[5]

[5] There is little wonder that Yehuda now suffers from a severe eating disorder, bulimia, as an adult. *See* PSR ¶ 69.

The family often sang traditional songs during the meals on the Sabbath, and that too presented an opportunity for abuse. Yehuda's brother Pinchas describes a common scene at the family table:

> It was a Friday night Shabbat meal. We are a very musical family, and we were all singing the traditional songs. Yehuda added his beautiful voice in harmony — second and third parts. Suddenly, our father lost control. He couldn't handle how gifted Yehuda was. He stood up, ripped him from his seat, and began to beat him.
>
> We were all stunned. My mother (of blessed memory) tried to protect us and moved us into the children's room, but my father burst in, continuing to strike Yehuda in front of all of us.
>
> It's [i]mpossible to describe the humiliation, the fear, the deep trauma of that night.

Ex. B, Pinchas Ringel Ltr. at 1-2.

When Yosef, Yehuda's older brother, would come home from school for weekends he was "horrified by Father's treatment of Yehuda. Sometimes Father ignored him completely, locking him in a room for hours while everyone else sat at the Shabbat meal. Yehuda cried, and we siblings were too afraid of Father to help." Ex. B, Yosef Ringel Ltr. at 1; *accord* Ex. B, Shmuel Yoskovitz Ltr. ("More than once, after a Shabbat at home, I saw deep sadness in Yehuda's eyes. He told me his father had not spoken a single word to him the entire Shabbat, or that his father had locked him in a room from midday until evening. It hurt him even more that his father would not speak to his mother. He described how his father would go to bed and throw his mother's bedding out of the room."). As a young child, the unceasing abuse Yehuda endured from his father is almost unthinkable.

Even in adulthood, when Yehuda visited his father for the Sabbath with his own children, Yehuda's father simply treated him terribly. His "[f]ather ignore[d] him, [didn't] speak to him, [didn't] appreciate what he brings or the joy he brings with the children, as if Yehuda were air."

Ex. B, Esther Zryl Ltr. at 3. Yehuda tried to let his father's rejection roll off of him as an adult. Still, Yehuda was wounded.

### 3. *Yehuda's Father Embraced his Neighbor's Children While Conspicuously Shunning Yehuda*

Compounding the direct abuse, Yehuda's father took every opportunity to further demean him by comparison to other children. Yehuda's older sister Esther describes that "[i]n the apartment opposite ours lived a divorced woman with two sons the same ages as Yehuda and his younger brother." Ex. B, Esther Zryl Ltr. at 2. Yehuda's father would lavish the neighbor's children with attention, while conspicuously snubbing Yehuda: "Father would regularly invite the neighbor's children to our home for the Shabbat meals, sit them on his knees, spoil them, give them sweets, while ignoring Yehuda and Pini, the younger brother, whose eyes burned with jealousy. This went on for several years." *Id*. at 2-3 (Yehuda's father "sent Yehuda to the neighbor's children to give them treats for Shabbat"). Yehuda's father "spoiled" the neighbor's children, "and took them to synagogue, while barely exchanging a word with Yehuda." Ex. B, Malka Schwartz Ltr. at 2; *accord* Ex. B, Yosef Ringel Ltr. at 1 ("We had a divorced neighbor with twin boys Yehuda's age. Father doted on them, bought them sweets, and let them sit on his lap in synagogue, while he refused to talk to Yehuda and forbade them to share their treats with him.").

Yehuda's father would use the neighbor's children as tools to mistreat his own son—during Sabbath meals, synagogue services, and whenever else he could. Ex. B, Malka Schwartz Ltr. at 2 (Yehuda's father would tell the neighbor's children things like "'Show Yehuda how to eat,' or 'Teach Yehuda how to help his father.'"). Yehuda's father literally sought to use the neighbor's children to add insult to injury.

### 4. *Yehuda's Father Found Every Opportunity to Inflict Anguish*

Yehuda's father's abuse was not limited to verbal torment. His father also routinely put Yehuda in terrifying situations when he was just a young boy. *See* Ex. B, Malka Schwartz Ltr. at 1 ("Father also liked to frighten Yehuda"). When Yehuda was just a little boy, his father would intentionally leave him stranded him, with younger siblings and cousins, just to be cruel. But Yehuda rose to the occasion, thinking on his feet to care for himself and his siblings.

Yehuda's brother Pinchas recalls one such instance when Pinchas "was seven and Yehuda was only nine." Ex. B, Pinchas Ringel Ltr. at 1. That week, one of Yehuda's older brothers was getting married, it should have been a happy time for the family, but:

> One evening, Yehuda and I were left alone in a pitch-black house — no electricity, no phone line, no air conditioning. Our father had shut off the utilities to "save money," while inflicting deep emotional damage on us.
>
> We were terrified. I remember sitting on the floor, crying. And Yehuda — just a 9-year-old boy — stood up, wiped his own tears, hugged me tight, and took charge. He knocked on a neighbor's door, borrowed two bicycles, and rode with me to our grandmother's house, a 15-minute journey in the dark — just to protect me.
>
> He was shaking. But he shielded me with all the love and strength he could gather. That moment defined him.

*Id*.

Yehuda's father knew he was inflicting psychological torture on Yehuda. He did so intentionally. He was merciless. One tactic Yehuda's father used was to simply abandon Yehuda while they were walking somewhere, so Yehuda thought he had lost his father. Yehuda's sister Esther describes one such "story" that she "can't erase from [her] memory." Ex. B, Esther Zryl Ltr. at 1. On that occasion:

> For a family celebration, Father once traveled from Jerusalem to Petah Tikva for Shabbat. He took twelve-year-old Yehuda, our eight-year-old brother and two small grandchildren. . . . It was August.
>
> . . .

> Father left Yehuda to drag a large suitcase, quickened his pace and eventually vanished –apparently to frighten the children.
>
> Yehuda was left alone with the heavy suitcase and three children in a completely unfamiliar place. He was very scared and anxious for the children. He was also concerned for his father in case he had truly disappeared as he "was not healthy" and Yehuda was worried that he would be called to task for not being close to Father. And thus, while wracked with fear and worry and taking responsibility for the three children that were with him, he took charge, asked passers-by for directions and led the group. A 25-minute walk became more than an hour in 100 degree heat. When they finally reached the address, he saw Father was waiting, smiling and engrossed in a plate of food, radiating pleasure, while the children arrived shaken. Yehuda carried that trauma for years.

*Id*.

Yehuda's father disappeared like that often. He caused Yehuda tremendous fear as a child, but then twisted the experience as an excuse to guilt Yehuda later. "On the thirty-minute walk to synagogue Father sometimes disappeared halfway there. Yehuda panicked that Father had disappeared, thinking something had happened. When Yehuda reached the synagogue he found Father sitting happily. Back at home Father yelled that Yehuda had supposedly abandoned him and that he had nearly fallen." Ex. B, Yosef Ringel Ltr. at 2.

Yehuda's father also tricked Yehuda into believing that family members were severely ill or injured, just to watch Yehuda's emotional turmoil. Yehuda's mother suffered from severe heart disease and other ailments when he was a child. Naturally, Yehuda constantly worried about his mother. That too was a tool for his father's terror.

> Mother suffered from heart disease. In the early years of her illness we didn't know exactly what it was, she was just somewhat weak. Each time Mother went to the doctor for a routine check-up she went quietly so the children wouldn't know (Father offered no support). To Mother's displeasure, Father would tell Yehuda that Mother was in the hospital and might have the cursed disease [translator's note slang for cancer].and that no one knew how much time she had left. Needless to say, Yehuda would suffer a panic attack on the spot, and Father would simply disappear. Only when Mother came home did she have to calm Yehuda and assure him she was fine.

Ex. B, Malka Schwartz Ltr. at 1.

Even as an adult, Yehuda's father took every chance he could to frighten Yehuda:

> A few years ago our eight-year-old niece was in a minor accident. Yehuda was at school [teaching], happened to phone home to check in, and Father answered. He told Yehuda a disaster had struck the family and enjoyed stringing him along, refusing to say what had happened. For several minutes Yehuda begged for details. Only then did Father claim the niece was in critical condition, even though she had already been sent home with just a light injury.

*Id*.

As an adult, Yehuda has worked hard to rise above his father's terrible treatment, and his nightmarish childhood. For many years before his passing just weeks ago, Yehuda's father was "ill with multiple sclerosis," and "Yehuda visit[ed] him regularly to lift his spirits, handle[d] his technical needs and medical file, tip[ed] the foreign caregiver generously, and ke[pt his] Father's fridge full." Ex. B, Esther Zryl Ltr. at 5; *accord* Ex. B, Itzchak Zilberberg Ltr. at 2 ("To this very day, Yehuda visits his father every week, treating him to delicious meals."). Of course, caring for his father was not easy for Yehuda, but he worked to not let his abusive childhood define him; he worked hard to do his part to care for an ill father, as he felt a son should. *See* Ex. B, Malka Schwartz Ltr. at 6 ("Despite the difficult relationship with Father, Yehuda visit[ed] him once a week, s[at] and talk[ed] with him, fill[ed] his refrigerator with good things, and every fourth Shabbat stay[ed]").

### B. Yehuda was Banished From Home at 12 Years Old and Sent to a School Where Staff Bullied Him

When he was just 12 years old, Yehuda was sent away from his parents' home permanently. Although there were many Judaic schools for boys his age in Jerusalem where his family lived, his father decided to send him to school more than two hours away in Arad, Israel. Yehuda's departure was not a long debated, or carefully planned trip far away from home. Instead, "Father decided he was fed up with him and, in anger, sent him to uncles he didn't know in another city—

no warning, no clothes, no basic gear. Yehuda stayed there a few months, studied in a new school, and had to live in a strange, alien place." Ex. B, Esther Zryl Ltr. at 3.

Yehuda's father tried to cut him off from the rest of the family while he was away. Yehuda's sister Esther explains that "Father told the uncle not to let Yehuda phone home. Yehuda felt lonely and abandoned. Mother, afraid of Father, didn't speak with him by phone when Father was in the house." *Id*. That effort to disconnect Yehuda wounded him deeply:

> Since then Yehuda has suffered separation anxiety. Even after he came home he couldn't speak to Father, and his trust in Mother, who had always loved him so much, was hurt. It took a long time to rebuild that trust and to understand that Father acted on his own, disregarding Mother's opinion.

*Id*.

Yehuda was also bullied mercilessly at the Yeshiva—and not just by the other students. *See* Ex. B, Malka Schwartz Ltr. at 3 ("Because of low self-confidence Yehuda had a hard time socially and, at times, was ostracized by most of his classmates."). The teachers, particularly the student body supervisor, called the "*mashgiach*," singled Yehuda out for harsh treatment. *Id.* ("Yehuda struggled to adjust at first, and the mashgiach [student body supervisor] of the yeshiva, notorious in the sect, decided to 'educate' him with a heavy hand."). That student body supervisor "stifled" Yehuda "at every turn. He criticized him for the smallest things and sometimes accused him unjustly. He often demeaned him, never gave him a moment of praise to make him feel he had value, barred him from the yeshiva's organized outings, and continually grilled him about every choice he made." Ex. B, Yakov Ringel Ltr. at 1; *accord* Ex. B, Yosef Ringel Ltr. at 2 ("It was in fact during the very years when a person forms his character, that Yehuda received degrading treatment from a mashgiach [student body supervisor] who hounded him relentlessly, knowing no one would defend Yehuda.").

This mean-spirited "discipline" lasted for years:

> For four years Yehuda endured deliberate abuse. Even after he managed to align himself with the yeshiva's rules, the mashgiach did not relent. He summoned Yehuda to his room and tormented him with trick questions. One story Yehuda often told: the mashgiach would call him in and ask, "What did you want?" Yehuda would answer that he wanted nothing, and the mashgiach shouted at him and humiliated him, saying, "Why do you not want anything? Do you want to grow up like your father?" The mashgiach frequently spoke to him about matters of kedusha or in our terms, the ban on masturbation, yet he interrogated Yehuda about it, making him feel as if he knew every thought in Yehuda's mind and all his struggles. Yehuda was left feeling threatened, frightened, and unwelcome before G-d.

Ex. B, Malka Schwartz Ltr. at 3; *accord* Ex. B, Yosef Ringel Ltr. at 2 ("The mashgiach often called Yehuda to his room, left him waiting outside for hours while Yehuda trembled with fear, and when Yehuda finally entered the 'educator' asked, 'What did you want?' Yehuda answered that he wanted nothing. The mashgiach then berated him, shouting, 'Why do you want nothing? Do you have no ambitions?' They often spoke with him about the prohibition against masturbation in Judaism and tormented him with intrusive questions that served no purpose.").

After four years, Yehuda finally left the Yeshiva in Arad. He looked forward to a reprieve. But none was forthcoming. Before he started his new school in Jerusalem, "[t]he same 'educator' alerted his colleagues not to forget to keep harassing him, because he was an easy target." Ex. B, Yosef Ringel Ltr. at 2; *accord* Ex. B, Malka Schwartz Ltr. at 3 ("When Yehuda moved up to the Yeshiva Gedola in Jerusalem, the same mashgiach from the small yeshiva briefed his colleagues there on how to treat Yehuda."). "Instead of starting fresh, Yehuda felt they watched him at every step, noting each run to the grocery or a simple trip home. They gave him no basic trust, and he already lacked any self-confidence." Ex. B, Malka Schwartz Ltr. at 3; *accord* Ex. B, Yosef Ringel Ltr. at 2 (at Yehuda's new school, "[t]hey followed his every trip outside the yeshiva, demanded explanations, and regularly rummaged through his closets, so he felt no one trusted him at all.").

Eventually, Yehuda was forced to abandon his studies. He left the structures of student life, feeling demoralized and driven out. Ex. B, Malka Schwartz Ltr. at 3 ("Yehuda felt that the Yeshiva Gedola was harming him and decided to leave and work. He changed his clothing, trimmed his beard, and tried not to reveal that he belonged to a Hasidic community."). Yehuda's entire childhood was marked by consistent abuse, at home and at school. As a child, Yehuda simply had nowhere to run, and no one to go to for the comfort, love, and support that every child needs.

### C. As An Adult, Yehuda Has Worked Hard To Move Beyond His Childhood, And Build A Life As A Productive Member Of Society

#### 1. *Yehuda Sought Therapy To Deal With The Years of Abuse He Endured*

Yehuda "suffered deeply in [his childhood] home — and later, in yeshiva — in ways that would have crushed almost anyone else." Ex. B, Pinchas Ringel Ltr. at 3; *accord* Ex. B, Malka Schwartz Ltr. at 4 ("Because of everything he had endured, Yehuda suffered terrible anxiety and occasional panic attacks that left him collapsed. He could easily have fallen into depression and despair, yet emotional therapy and medication slowly put him back on his feet."). Throughout his childhood, he was the singular object of relentless bullying by his father and teachers. "Any other child would have abandoned everything and spiraled out of control. But Yehuda? He fought back. He chose growth. He chose life." Ex. B, Pinchas Ringel Ltr. at 3

When he finally escaped, Yehuda desperately did not want his childhood pain to define his life. "Yehuda — never gave up. He didn't become bitter. He didn't run away from life." *Id*. at 2. Once an adult and out of his father's clutches, Yehuda took the initiative to "rebuil[d] himself from the ashes." *Id.*; *accord* Ex. B, Esther Zryl Ltr. at 1 ("he picked himself up, and how he rebuilt his life, pushed himself down a hard and strenuous road and today, as his big sister, I'm proud of him.").

Although not common in the ultra-religious circles in which he grew up, Yehuda "went to therapy. He paid for it out of his own pocket. He faced the darkness head-on." Ex. B, Pinchas Ringel Ltr. at 3; *accord* Ex. B, Malka Schwartz Ltr. at 4 ("At the same time he began seeing a professional to shed his low self-image. Yehuda invested heavily, paying a personal coach to guide his growth and help him overcome the hardships of his youth."); Ex. B, Yosef Ringel Ltr. at 3 ("Faced with all this, Yehuda decided, "If I am not for myself, who will be for me?" He began therapy, opened every wound until it healed, and with tremendous willpower lifted himself up from the dust."). He proactively invested in his recovery for years, which he has continued to do while on pretrial release in this case. *See* Ex. B, Esther Zryl Ltr. at 3 ("Only after years of psychological and psychiatric treatment did Yehuda heal"); PSR ¶ 71.

**2.** ***Yehuda Is A Superlative Father, Providing His Children With The Fatherly Love and Security He Never Had***

Through perseverance, Yehuda successfully built a life for himself as a family man, father, husband, and business owner. "[H]e is a devoted husband, a loving father, a community member," and was until his arrest, "a successful small business owner;" he "rebuilt a home with peace, with values, with love — the very things he was denied." Ex. B, Pinchas Ringel Ltr. at 3.

Yehuda is the father of two small children, ages six and three. Because of what he endured as a child, Yehuda understands how important a loving, caring and present father is to a child. "Above all, he is the father of [his] children." Ex. B, Bat-Sheva Ringel Ltr. 2. "Yehuda is the opposite of the father he had. He is devoted, loving, responsible, and caring; he takes life seriously. Everything he does is guided by one thought: how to raise his own children with stability and love." Ex. B, Esther Zryl Ltr. at 4; *accord* Ex. B, Itzchak Zilberberg Ltr. at 1 ("Anyone who knows him well understands how deeply he embraces parenthood as a true calling: he never misses an opportunity to invest in his children, to instill in them good values, to be present and involved in

every aspect of their lives, and to give them a healing experience for what he himself went through.”).

And since becoming a father, Yehuda has structured his life around his children. Yehuda’s wife Bat Sheva describes how “Yehuda was part of their [children’s] everyday lives - from the smallest routines to the important moments. They were used to knowing that their father was there. They loved him, trusted him, and felt safe with him.” Ex. B, Bat Sheva Ringel Ltr. at 2. Specifically:

> Every morning, he would take them to preschool, making sure they were clean, well-groomed, properly dressed, and had everything they needed. Just before they entered the preschool, he would send me a photo or video of them, simply so I could feel reassured and know that they were in good hands.
>
> On days when he did not have an event, he would ask whether it would make things easier for me if he picked them up at the end of the day. He would often take them to the park, to visit their grandparents, or simply sit and play music with them at home. He created beautiful memories for them—moments that our older son would call “special father-and-son time.”
>
> Even on his busiest days, when he had an event, he never gave up his short video call with the children before bedtime. He would wish them good night, tell them how much he loved them, and remind them to be good and make things a little easier for me.
>
> It was precisely in these small, everyday moments that his deep love for our children, his devotion to them, and his constant concern for my well-being were most clearly expressed.
>
> We were a happy family. We had work, a home, routines, plans, and dreams. We looked forward and thought about the years ahead and the future we hoped to build for our children.

*Id*.

Yehuda is patient with his children, and simply present with them. He prioritizes his time with his children. Before his arrest:

> Every day Yehuda c[a]me[] home to prepare dinner and put the children to bed. He reads them a story and listens to them with deep emotion. In the morning he takes [his] five-year-old [son] to school (Yehuda found him the best school in the city,

> even though it's much more expensive), and he also [took his younger son] to the caregiver every morning.

Ex. B, Yakov Ringel Ltr. at 2; Ex. B, Yosef Ringel Ltr. at 3 ("Despite [Yehuda's] demanding work . . . Yehuda invests in his children and never lets it cut into father-child quality time.").

Although the last 16 months since his arrest have been tremendously difficult for Yehuda personally, he has continued to put his children first. He does not want to miss a moment with them. He does not want the consequences of is crime to impact them anymore than it already has. He has tried his utmost to insulate them from the impacts and uncertainties of the last year, telling the Court: "I want to invest my strength in my family, to be a husband my wife can rely on and a present father whose children feel safe beside him. I want to give my children the emotional presence, love, and security that I often missed in my own childhood . . . . all I hope for in an opportunity to . . . raise my children with responsibility and love." Ex. A, Yehuda Ringel Ltr. at 3.

Yehuda's sister in law, Chaya Ringel, who lives just down the block and sees him regularly, remarks how:

> Despite everything he has been carrying, Yuda has remained an incredibly hands-on and devoted father . . . . He helps [his children] with their homework, gets them ready in the mornings, sits with them at bedtime, and is present for all the small, everyday moments a father provides. . . . What has struck me most this year is not the hardship itself, but how Yuda has carried it. Despite losing his livelihood, his home, and the life he built, he has worked hard to keep his family's spirits up. He sings, plays music, and laughs with Yoni and Uri, doing everything he can to give them some sense of normalcy in a year that has been anything but normal.

Ex. B, Chaya Ringel Ltr. at 2-3. To Chaya, Yehuda has been an inspiration: "His resilience, and his determination to shield his children from the full weight of what this family has lost, speak to his character as a father and a husband." *Id.*.

### 3. *Yehuda is a Thoughtful and Supportive Husband; His Wife Bat Sheva Relies on Him to Make her Life Work*

Yehuda's commitment to support and care for his wife, Bat Sheva (Shevi), is second only to his devotion to his children. Bat Sheva describes how she and Yehuda "built [their] lives together" as a family from nothing; "[n]othing was handed to [them]." Ex. B, Bat Sheva Ringel Ltr. at 1.

In everything Bat Sheva has done, whether at home or at work, Yehuda "was always a supportive and involved partner," helping her thrive. Ex. B, Bat Sheva Ringel Ltr. at 1. Bat Sheva's success was Yehuda's success, as she explains: "he always supported me, encouraged me, and celebrated my own progress. We were a team. When one of us struggled, the other carried more. When one of us succeeded, we both celebrated. We made decisions together, raised our children together, and dreamed together about their future and ours." Ex. 1, Bat Sheva Ringel Ltr. at 1.

Bat Sheva provides one example of Yehuda's investment in her success:

> On one occasion, during an especially demanding period at work, I was responsible for organizing an important event and hosting guests to a very high standard, and I felt completely overwhelmed by everything I had to manage. When I shared this with Yehuda, he immediately told me, "Your success is my success. Take the burden off your shoulders—I'll take care of everything."
>
> Even though he had a major event of his own that day, he arranged for his employees to handle what was needed and came to my workplace himself with another employee. Within a short time, they had prepared and arranged everything beautifully. The event was a great success, and I received many compliments from the guests as well as from my manager. To me, it was another small but meaningful example of how much of a team we truly were, and how I could always count on him to be there for me.

Ex. B, Bat Sheva Ringel Ltr. at 1.

Bat Sheva sums up best just how crucial Yehuda is to every aspect of her life: "To me, Yehuda is much more than a husband. He is my closest friend. He is the first person I want to tell

when something good happens and the person I look for when life is difficult. He is my partner in life and the person with whom I built my home." Ex. B, Bat Sheva Ringel Ltr. at 1. Yehuda's absence last spring and summer thus left a void not just in the family's life, but was a gaping hole for Bat Sheva personally. *See, e.g.,* Ex. B, Chaya Ringel Ltr. at 2 ("Shevi has leaned on him for this more than I think she even realizes, and I honestly do not know how she would manage . . . on her own, day in and day out, without him there beside her.").

#### 4. *Yehuda Built A Successful Business, and was The Primary Financial Support For His Family at Home in Israel*

Mr. Ringel takes his responsibilities as a father and family man seriously. In addition to the time and effort he devotes to caring for his children, Yehuda has been the family's primary financial support. *See* Ex. B, Esther Zryl Ltr. at 4 ("Yehuda is a devoted husband who supports his family with dignity and looks after them. At home he handles the household budget, the shopping, and even the cleaning.").

Yehuda has worked hard to support himself throughout his adult life. Once he left Yeshiva, "he took charge of his life, worked various jobs to earn an honest living." Ex. B, Esther Zryl Ltr. at 4. First, he worked "as customer service in a shoe store, then moved on to special education at the 'Siach Sod' institute in Jerusalem. . ." *Id*. Yehuda excelled in his work in special education: "As a special-education teacher, the pupils grew very attached to him because he gave his all and even volunteered extra hours." *Id*.

After working in special education for several years, "Yehuda opened a butcher shop in Bnei Brak," in Israel with his wife's encouragement, which "flourished and succeeded." *Id.*; *accord* Ex. B, Malka Schwartz Ltr. at 4-5 (Yehuda "began selling rare, premium beef cuts. The shop became well known for spotless cleanliness, friendly service, and quick deliveries."); Ex. B,

Yakov Ringel Ltr. at 3 ("Yehuda and a friend opened a butcher shop. . . . he distinguished himself with impeccable cleanliness and especially reliable, speedy customer service.").

When he started to succeed, Yehuda used his shop to help community members in need. His sister explains that "[m]ore than once I saw Yehuda send packages of meat and poultry to needy families at no charge, without letting them know he was the donor. That's typical of Yehuda." Ex. B, Malka Schwartz Ltr. at 4-5.

With a flourishing small business up and running, Yehuda began to branch out. He started a catering and events planning business. He worked tirelessly serving his customers at their events, and his excellent reputation for punctilious customer service is a point of pride. Thus, Yehuda has catered events for high profile people, including members of the Israeli Parliament. Ex. B, Esther Zryl Ltr. at 5 ("Members of Knesset [Parliament] turn to him for their private events; he handles every detail, from tables, flowers, and lighting down to the smallest element.").

Yehuda was equally proud of his track record for his unparalleled treatment of employees and staff. Although providing excellent service to customers is stressful, Yehuda prioritized "treating all the staff, the cooks, the waiters, everyone, with great respect." Ex. B, Malka Schwartz Ltr. at 4-5. Yehuda's handling of an employee's costly mistake typifies Yehuda's patience and humanity as an employer:

> When an employee caused a significant loss (having forgotten a large quantity of expensive meats in the oven), Yehuda chose not to fire him, but rather to guide and mentor him. That employee went on to become one of the team's most outstanding performers—thanks to Yehuda's patient, instructional approach. This is a clear indication of caring, the ability to support others, and a genuine investment in both the work and the staff.

Ex. B, Itzchak Zilberberg Ltr. at 2.

Yehuda's arrest shuttered his business. With no warning, Yehuda was arrested in this case while on a family trip to New York, far away from his home in Israel. His clients were left

hanging—they had no notice that Yehuda could not fill their orders, or provide the catering services they expected. *Id*.

After overcoming a truly awful childhood marred by pain and abuse, to build a strong business to care for his two precious sons, Yehuda's years of hard work, and his stellar reputation were unceremoniously destroyed overnight.

## IV. THE LAST YEAR SINCE YEHUDA'S ARREST HAVE DISLOCATED HIS FAMILY FROM THEIR LIVES IN ISRAEL, AND BROUGHT FRESH TRAUMA ON YEHUDA AND HIS YOUNG SONS

The last approximately year and a half since Yehuda's arrest have been harrowing for Yehuda and his family. Yehuda was suddenly arrested at the airport while the family was traveling here from Israel where they live, to celebrate Yehuda's brother's wedding. Yehuda's young children saw him taken away from them at JFK Airport. They did not see him again for nearly five months while he was incarcerated at the MDC. Even since his release on bail last year, Yehuda and his family have struggled. They are not from here. They do not speak the language. They do not have jobs here. They do not have friends here. The last year, they have been separated from their routines, their lives, and their support systems. The children have suffered from the dislocation from their home environments. Both Yehuda and his wife lost their jobs. They cannot work here. The year was capped off by the passing of Yehuda's father just weeks ago—Yehuda felt the separation from his large family in Israel acutely as he was unable to mourn with his siblings who were all together back home. Although anything is better than the separation they endured while Yehuda was in custody, the last year has nonetheless been very hard on Yehuda, his wife and his .

### A. Yehuda Was Mercilessly Bullied at the MDC; Neither Guards Nor Other Inmates Protected Him

Yehuda's nearly five months in custody at the MDC was a real shock for his family. Mr. Ringel, an Israeli resident and an Israeli national, who came to the United States simply for his brother's wedding, was arrested at the airport in front of his young children. From there, he was quickly swept off to the MDC where he could not speak much to his children, he could not care for his family, and he was subject to harsh conditions from both the staff and his fellow inmates.

Yehuda was an easy target for mistreatment by other inmates at the MDC—just as he had been decades earlier in school. And the MDC staff often participated in his torment, or turned a blind eye. Yehuda describes the "months when I was incarcerated at MDC Brooklyn" as "some of the hardest of my life." Ex. A, Yehuda Ringel Ltr. at 1. Beyond the deep sadness of being "separated from [his] family," and of knowing "that [his] wife and sons were suffering daily because of [his] actions and the situation [he] had brought upon [them]," he personally suffered as well. Ex. A, Yehuda Ringel Ltr. at 1.

Yehuda was "particularly vulnerable" to mistreatment at the MDC. *Id*. He spoke "limited English," which prompted taunting and torment from the corrections officers: "At times, I was given instructions that I could not understand, and when I failed to respond correctly, I was subjected to yelling and severe humiliation in front of others." *Id*.

But that was nothing compared to the physical bullying he experienced from other inmates, without intervention from MDC staff:

> On one occasion, while I was walking through the common area, I passed another inmate and my elbow or arm apparently brushed against him accidentally. It was completely incidental contact. Other inmates who were present began encouraging him to react and escalate the situation. In that moment, I felt as though I had become an easy target - a foreigner with limited English whom others could provoke and intimidate. In that atmosphere, the inmate took out a razor blade, cut me near my wrist, close to my veins, and threatened to remain there and watch me bleed to death.

> On another occasion, an inmate who did not want to share a room with another person pulled me from the top bunk and threw me to the floor. In another incident, an inmate cursed and humiliated me and then struck me forcefully in the face, breaking two of my teeth, which remain unrepaired. Food also sometimes became a means of mistreatment. Because I previously underwent gastric-reduction surgery, I need to eat small amounts more frequently. A person sharing my room knew this and would sometimes deliberately take or hide food from me. Together, these experiences created a continuing sense of fear and helplessness.

*Id*. at 1-2.

Even seeing second-hand the impact of Yehuda's experiences at the MDC left a mark on Yehuda's family. Yehuda's sister in law, Chaya, describes:

> While Yuda was in jail, it was one of the hardest periods for our family to watch. Yuda is such a soft, gentle soul, nothing like the people he was surrounded by there, and the things he witnessed while incarcerated broke him in ways that were painful to see, even from a distance. Yuda would call my husband, Usher, regularly, and Usher would speak with him with such patience and warmth, doing everything he could to keep Yuda's spirits up and remind him he was almost out. But Yuda was so broken during that time that it was hard for any of us to watch. I was there more than once when Usher hung up the phone after one of those calls and simply broke down crying himself, carrying the weight of trying to hold Yuda together from the outside.

Ex. B, Chaya Ringel Ltr. at 1; *see also* Ex. B, Bat Sheva Ringel Ltr. at 4 (describing Yehuda as "struggling with severe post-traumatic stress as a result of what he had experienced while in custody").

Once he was released from the MDC, Yehuda continued to bear the emotional wounds he sustained there. When he first moved to an apartment in Lakewood, New Jersey with his family, "he kept breaking down. He would wake from nightmares, or simply stay awake rather than sleep, so he wouldn't have to relive the painful things he had gone through." Ex. B, Chaya Ringel Ltr. at 1. The most mundane encounters threatened to send Yehuda spiraling:

> Something as ordinary as a knock on the door would send him into a state of panic. He would freeze in place, his whole body would tense, and I would watch him hesitate, sometimes for several long moments, before he could bring himself to answer, checking first who was there. This was a reaction I never once saw in him before this year, and it became something the whole family adjusted around . . . .

> Shevi often had to step in and answer in his place, or reassure him afterward that everything was fine, just to help him settle back down.

*Id*.

Yehuda has tried mightily to insulate his children from his struggles, "he kept doing everything he could to shield his children from seeing just how deeply it affected him." *Id*. Still, Yehuda's children have "picked up on" his heightened anxiety: "They would go quiet or glance over at him whenever there was an unexpected sound at the door, watching to see how he would react before they themselves relaxed." *Id*.

The trauma of sudden separation at the airport, and Yehuda's monthslong incarceration in the harsh conditions of the MDC have taken a toll on the entire family: "Everything this family endured left its mark on him, feeding anxieties he had never carried before;" Yehuda's sister in law Chaya "watched it ripple through the whole household." *Id*.

### B. The Children Have Not Fully Overcome The Five Months of Separation They Endured When Yehuda Was Incarcerated at the MDC

Experiencing their father being ripped away from the family suddenly, while they were supposed to be coming to the United States for the joyous occasion of Yehuda's brother's wedding, was a shock to the children. And they have yet to recover from the nearly five months of separation that followed. *See, e.g.,* Ex. B, Bat Sheva Ringel Ltr. at 2 ("We traveled together to the United States for what was supposed to be a family trip and to attend Yehuda's brother's wedding. We left Israel as a family - Yehuda, our two children, and me - with luggage, excitement, and plans to return home a few weeks later. At the airport in the United States, Yehuda was arrested. I left with our children and our luggage, while he remained behind. I still carry the feeling of that moment with me. The children were with me, but their father was not. I was in a foreign country, frightened and uncertain, with no idea when we would see him again.").

Yehuda's family returned to their home in Israel while he was incarcerated at the MDC. For four and a half months, it was almost like he had vanished. And although his children, ages five and two at the time, "were too young to fully understand what had happened, they felt their father's absence deeply." *Id*. Bat Sheva "watched [her] children change" during that time, and she could not fully provide them the stability they needed. *Id*. at 4 ("They were too young to understand everything that was happening, but they were old enough to feel that their father was missing and that their mother was no longer the same calm mother they had known."). Bat Sheva "felt" during "this entire period . . . that the children were in a constant state of alertness, as though they were always trying to understand what was happening around them and what might happen next." *Id*. Even the children's sleep was impacted: "They no longer felt safe sleeping alone and insisted on sleeping with [their mother] in [her room] room, in their father's bed. . . . They were constantly alert, sensitive, and frightened, as though at any moment something else might happen that would once again change their lives." *Id*.

Each of Yehuda's young children also manifested the stress and sadness of their father's sudden absence in their own individual ways. Yehuda's "younger son was only two years old at the time," and when he returned to Israel without his father, he began to experience a severe physical reaction because of the stress and anxiety of his father's sudden absence. As Bat Sheva describes:

> Until that day, [their two year old son] loved going to preschool, but suddenly he began clinging to [his mother] with all his strength and refused to separate from [her], even for a moment. He developed severe separation anxiety and would not stay with anyone else. At the same time, sores and allergic reactions began appearing on his body. When [she] took him to the doctor, the doctor told [her] that it appeared to be an allergic reaction and asked whether the child had recently experienced an emotional event or a significant change at home or at preschool, explaining that it could be related to emotional distress. During that period, [Bat Sheva] found [her]self taking him to the doctor approximately every two weeks because of a different issue or symptom that had developed.

*Id*. at 2.

Yehuda's older son, who was five at the time, has an equally severe reaction to his father's sudden absence from his young life. Bat Sheva describes:

> Our older son, who had always been an exceptionally happy, sensitive, and intelligent child and was deeply attached to his father, changed before my eyes. He began gaining weight rapidly, became sad and extremely sensitive, cried constantly, and reacted intensely to even the smallest things. The child who had once been grateful for everything and found joy in the simplest things suddenly became frustrated, unhappy, and withdrawn. He also struggled at preschool, and his teachers noticed that he was no longer the same child they had known.

*Id.*; *accord id.* at 4 ("My older son was only five years old at the time, but he was an exceptionally intelligent and sensitive child. From time to time, he would make comments that made me realize he understood far more than I had thought. He heard me speaking about lawyers and court proceedings, asked questions, and tried to connect the pieces and form his own understanding of what was happening—a reality that no five-year-old child should ever have to comprehend.")

Although the children were too young to understand precisely what had happened, because Yehuda had always been enmeshed in every aspect of their daily lives, they could not cope without him. Per Bat Sheva: "The children did not have the words to explain what they were going through, but their behavior expressed the same heartbreaking cry: 'We don't have Daddy. We want our Daddy.'" *Id*. at 3. For Bat Sheva, "[i]t was heartbreaking . . . to witness;" her "two young children whose world should have been simple and safe, trying to understand a reality they never should have had to know, and desperately searching for the sense of security they had lost when their father was taken away from them." *Id*. at 4.

Although Yehuda was released on bail and reunited with his family approximately a year ago, his children still have not fully recovered from their monthslong separation. Bat Sheva describes an experience that occurred just a few weeks ago, reminding her how "[e]ven now, a

year and a half later . . . just how deeply this experience has stayed with them." *Id*. at 3. Specifically:

> A few weeks ago, I entered a building in Brooklyn with my younger son. There is a supermarket on the upper floor, and for some reason the building reminded him of the airport. He suddenly held onto me tightly and began crying, saying that he did not want to go into the "airport" because "they took Daddy away from us." I stood there with tears in my eyes. I could not believe that this memory was still so deeply etched in his mind.

*Id*. For Yehuda and Bat Sheva, "[i]t is incredibly painful . . . to know that, even today, our children continue to carry such profound emotional scars from the time when we were without Yehuda." *Id.*

### C. Yehuda's Children Have Struggled Over The Last Year Away From Home

Their temporary life in the United States this last year—far away from their friends, their schools, their daily routines, and even their mother tongue—has been jarring for Yehuda's children too.

> Our children also paid a heavy price for the circumstances that were forced upon us. They arrived in the United States without knowing the language, and during such a sensitive period, while Yehuda was struggling with his own situation . . . .
>
> Our older son was sent to a school where the language was completely unfamiliar to him. Every day, he came home frustrated because he could not understand what was being taught, communicate with his classmates, or feel that he belonged. He missed his school in Israel, his friends, his familiar language, and the environment he knew. Every day became a struggle that a child his age should never have had to endure.

*Id*. at 6.

Yehuda's younger son, who was two, had no free schooling options available in the United States, and Yehuda's family could not afford the private tuition of a two year old daycare program. So, whereas he would have been in school in his home country, in the United States, their "younger son was forced to remain at home instead of going to preschool, learning, playing, and spending time with children his own age. There were days when it was too cold to go outside and days when

it was simply too hot, and he spent long days at home without the structure and companionship that he so desperately needed." *Id*.

As a mother, it has been "heartbreaking" for Bat Sheva to watch as her "children pay the price for circumstances they had no ability to understand or change—one child trying to navigate a new life in a language he did not understand, and another forced to remain at home, when he should have been learning, playing, and growing alongside other children his age." *Id*.

For Yehuda, the pain of watching his children struggle because of his actions is worse yet, telling the Court: "[m]y wife, my children. . . have carried a heavy burden with me. My older son suffered physically from anxiety during this period, and my younger son began stuttering and wetting the bed at night." Ex. A, Yehuda Ringel Ltr. at 1. Witnessing what his children have endured since his arrest has only stiffened Yehuda's resolve to ensure his actions never again jeopardize his children's stability: "Seeing their pain has made me understand that my responsibility as a father is not limited to loving and providing for them; it also includes the choices I make and the sense of safety I create around them." *Id*. The hard lessons Yehuda has learned witnessing his children's suffering because of his crime, obviate the need for a further period of incarceration. A time served sentence is warranted for Yehuda.

### D. Yehuda and His Wife Have Also Struggled Since His Arrest—Living Two Continents Away From Their Home During the Pendency of This Case Has Taken a Real Toll On Their Lives and Careers

For Bat Sheva and Yehuda, this last year has upended every aspect of their lives as well. They too are far from much of their extended families, their communities, their work, their routines, and their general environment 6,000 miles away from their home in Israel. Bat Sheva explains that this year:

> One of the greatest difficulties was finding [her]self in a foreign country, far away from [her] family, friends, and the life [she] had always known, while trying to care for two young children . . . [She] barely knew anyone. [She] had no friends or

> family there, [she] was not fluent in English, [she] had no car, and [she] had no support system.

Ex. B, Bat Sheva Ringel Ltr. at 4. Life in the United States has thus been extremely difficult:

> Even the simplest things, such as going to the grocery store, became a major undertaking. I had to take both children with me everywhere, regardless of the weather—through the extreme cold and snow, and later through the intense summer heat—and try to navigate the streets of a foreign country without being able to communicate comfortably in the language.

*Id*. at 5.

Yehuda and Bat Sheva's long absence from Israel has also upended every aspect of their lives, including their employments. When they came to the United States in May 2025, prior to Yehuda's arrest, they were both gainfully employed supporting their young family. Now, after a year uprooted from their home, neither has been able to maintain their work from here.

Bat Sheva had to choose between keeping her family together and keeping her job. Of course, she chose her family. But the loss of her work has been painful: it is both a financial burden on the family, and a loss of purpose and camaraderie for her. Bat Sheva had worked as an administrator in "a major nonprofit organization in Israel" for six and a half years. *Id*. She "loved [her] work." *Id*. It brought her real meaning. She "woke up every morning with a sense of purpose, fulfillment, and pride, and [she] felt that [she] was an important part of the organization and the people within it." *Id*. Bat Sheva was an integral part of the organization, so "[w]hen everything changed and [she] was suddenly forced to leave Israel, [her] manager tried to allow [her] to continue working remotely, understanding that the situation was temporary and that [she] would soon be returning home." *Id*. But as time dragged on, working remotely from so far away was simply impossible. And, "eventually, the phone call [she] had been dreading came," and Bat Sheva lost her job. *Id*. With that, Bat Sheva "lost not only a job that [she] had loved with all [her] heart, but also the last remaining source of income [her] family had." *Id*.

Yehuda too has been unable to work to support his family here in the United States. He has lost the business that he painstakingly built over years. *See supra* § III(C)(4). And because he does not have immigration status or a work permit here, he has been unable to work while on bail. That has left the family struggling financially, and Yehuda often at loose ends, looking for a way to use his time productively. Yehuda's sister in law Chaya explains:

> Before this year, Yuda ran his own catering business, juggling a full slate of responsibilities every day, and was doing very well for himself and his family. Since being forced into exile, that stability has been upended. Instead of going to work, Yuda has spent his days watching his children leave the house each morning to attend school in a country that is not their own. . . . Yuda, who once ran a thriving business and provided generously for his family, has had to seek help simply to put food on the table and keep a roof over their heads.

Ex. B, Chaya Ringel Ltr. at 1-2; *see also* Ex. B, Bat Sheva Ringel Ltr. at 5 ("Yehuda's business stopped. Our financial situation deteriorated badly. Our savings were depleted and debts accumulated. Later, I also lost my job.").

The "shame" of having to ask "friends and business associates" for "money to cover his family's daily needs" has been hard for Yehuda to bear and for his family to watch. Ex. B, Chaya Ringel Ltr. at 2 ("This was a man who used to be the one others turned to for help, now having to ask people who remembered him at the top of his business for money just to get by, and I could see how much that ate away at him every single time he had to pick up the phone and make that call again."). Yehuda knows that the blame for his family's financial ruin lies squarely with him. He takes that culpability seriously, and he knows it is his solemn responsibility to ensure his family's future stability. *See* Ex. A, Yehuda Ringel Ltr. at 1-3 ("This period has forced me to stop and look honestly at myself, my responsibility, and the consequences of the actions and choices that brought me here. . . . I also understand that the price of my actions was not mine alone. My wife, my children, . . . have carried a heavy burden . . . . I want to return home . . . support my

wife, raise my children with responsibility and love, and demonstrate through my actions that I have learned from this period.").

### E. Yehuda's Father Passed Away Recently While Yehuda was On Bail In the United States, Preventing Him From Mourning With His Extended Family

Yehuda has never felt the pain of being so far from home—of being stuck here away from his extended family and environment—more acutely than when his father passed away just a few weeks ago. Although Yehuda had a very difficult relationship with his father, or perhaps because of that relationship, not being able to fully participate in mourning his father with the rest of his family was devastating for Yehuda.

While the Court ordered modification of Yehuda's bail to allow him to mourn with his two brothers here in Staten Island for the first two days after his father's passing, Yehuda was alone for most of the mourning period. Of course, Yehuda could not attend his father's funeral in Israel because of his conditions of release in this case. And for the same reason, he could not mourn fully with his family either.

The Jewish mourning period following passing of a loved one, *shiva*, lasts a week. Yehuda's two American brothers remained here with him for *shiva* for the first two days, but traveled to Israel to mourn with their extended family thereafter. *See* Ex. B, Chaya Ringel Ltr. at 2 ("After the first two days of Shiva, Usher and his brother Pini traveled to Israel to sit Shiva with the rest of the family."). Yehuda's sister in law, Chaya, who also is his neighbor here in Staten Island, writes how: "The Ringel siblings are an unusually close family," and "Yuda felt such keen pain at not being able to be there for that, at missing the chance to sit with his siblings during those days and grieve their father together the way this family always has." *Id*.

Yehuda is poignant about his father's recent passing, but seeks to use his grief as a reminder of the importance of using his one precious life productively:

> Only a few days ago, my father passed away. In the midst of that grief, I was reminded how short life is and how deeply I want the next chapter of my life to be different. I want to invest my strength in my family, to be a husband my wife can rely on and a present father whose children feel safe beside him. I want to give my children the emotional presence, love, and security that I often missed in my own childhood.

Ex. A, Yehuda Ringel Ltr. at 2-3. Yehuda has internalized the wrongfulness of his conduct, and his responsibility to do better for his children. Yehuda's father's own passing, and his inability to fully mourn because of his bail conditions, was a painful reminder of his job as a father.

## V. A CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE THE TWIN AIMS OF FEDERAL SENTENCING: DETERRENCE AND REHABILITATION

While Yehuda's crime is certainly serious, the yearslong sentence provided by the Guidelines does not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to meet the sentencing statute's goals. A just punishment would give Yehuda an opportunity to continue rebuilding his life and caring for his family. Only a time served sentence, would give him that chance.

Nor would a Guidelines sentence promote deterrence. The sentencing statute requires that the Court impose a sentence that is "sufficient, but not greater than necessary," to "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(C), (D). Yehuda has already felt the consequences of this serious criminal with months of hard time at the MDC, and an additional year away from his home, employment, and routine. The general and specific deterrence goals of sentencing are thus achieved without a custodial sentence. Because Yehuda is an Israeli national who lived in Israel until his arrest, committed the offense conduct while in Israel, and hopes to return to Israel as soon as possible, the import of both general and specific deterrence is diminished in this case. He will not be here

after this case concludes. A custodial sentence would be "greater than necessary," contravening the sentencing statute.

### A. Yehuda is Deeply Sorry for His Crime and Presents No Danger to the Community

Yehuda is deeply remorseful, and readily accepts responsibility for his crime, telling the Court: "I take full responsibility for my actions. . . . I know that I deserve whatever punishment the court sees fit, all I hope for is an opportunity to begin a new chapter." Ex. A, Yehuda Ringel Ltr. at 3. And Mr. Ringel takes seriously that any remorse, and sorrow he has for his crime, must be paired with resolve to rehabilitate, candidly explaining in his letter:

> This period has forced me to stop and look honestly at myself, my responsibility, and the consequences of the actions and choices that brought me here. I am deeply sorry and ashamed of my actions. As a father, it pains me especially to understand that my actions contributed to an environment in which young children can be victimized. When I look at my own children, I understand even more deeply my responsibility to protect them, teach them, and create a safe and protected environment for them.
>
> . . .
>
> During my time here, I met with a therapist, and therapy became an important part of my process. I gained a deeper understanding of the reality that that even though I cannot always control what happens around me, I am responsible for how I respond, the choices I make, and the environment I choose to be in. I learned tools, like pausing before acting, identifying situations and environments that are not right for me, establishing clear boundaries for myself, creating structure, and working consistently toward the goals I set.
>
> One of the most important things I have learned is to think differently about safety. For me today, safety means active responsibility . . . not only through words, but through my choices and actions over time.

*Id*. at 1- 2.

Yehuda has internalized how wrongful his conduct was, and committed himself not just to a law abiding life, but to the self-reflection necessary for true rehabilitation. And Yehuda longs for the opportunity to put these tools and lessons into action as he moves forward:

> I want to return home to my country with my family, continue therapy, rebuild our livelihood, support my wife, raise my children with responsibility and love, and demonstrate through my actions that I have learned from this period. I know I cannot erase the past, but I hope for the chance to build from it a better, safer, and more responsible future.

Ex. A, Yehuda Ringel Ltr. at 3.

Indeed, Yehuda's conduct throughout his long period of pretrial release is a testament to his path towards rehabilitation, and his lack of dangerousness. Indeed, Pretrial Services has permitted Yehuda to live with his children since his release last year. *See* PSR Addendum at 1-2. He has cared for them as a father should without incident. Manifestly, Yehuda does not pose a danger to anyone—and by accepting full responsibility for his crime, Yehuda has demonstrated his will to ensure he does not run afoul of the law again.

With his nearest and dearest who have supported him throughout the difficult time since his arrest, Yehuda has been forthcoming about the gravity of his past wrongs, and his commitment to never again straying down the criminal path. Chaya Ringel, his sister in law who has been deeply enmeshed in Yehuda's life this last year reflects:

> I also want the Court to know how deeply remorseful Yuda is about everything that led to this case. I have heard him speak about it with real regret, not making excuses for himself, but genuinely reflecting on what he could have done differently and how much he wishes he could go back and change his choices. This past year has changed him. He has grown, he has reflected, and he has shown, through everything he has done to hold his family together despite his own pain, that he is committed to moving forward as a better man for his wife and his children.

Ex. B, Chaya Ringel Ltr. at 3.

And Yehuda and his wife Bat Sheva have had many heart to heart conversations about his crime and their future:

> I have also seen how deeply Yehuda understands the pain and consequences that arose from the circumstances that led to this case. He is deeply sorry for the choices and circumstances that brought us to this point, and he understands now, in a very personal way, how high the price has been for our entire family. As a father, this has affected him especially deeply. He has always wanted to provide our children

> with safety, stability, and a protected environment, and he understands how much this period disrupted the very sense of security he wanted to give them. He has taken this very seriously.
>
> During our time here, Yehuda met with a therapist who helped him process what had happened, look honestly at himself and his responsibilities, and begin building a healthier and more responsible path forward. I have seen in him a sincere desire not simply to put this period behind him, but to learn from it and to build a better future—for himself, for me, and especially for our children.

Ex. B, Bat Sheva Ringel Ltr. at 6. And Bat Sheva knows that Yehuda will implement the progress he has made this last year; she knows she can rely on him to do as much for their young family, explaining:

> We know we cannot recover the time that was lost. We cannot erase the pain. We cannot give our children back the months when their father was not with them. And we cannot become exactly the same people we were on the day we left Israel.
>
> But we can choose what we do from here. We can rebuild. We can work. We can be good parents to our children. We can create a home again with stability, love, and security.
>
> I believe with all my heart that Yehuda can do that. I have known him for years as a person, a husband, and a father. I have seen him during the happiest periods of our lives and during the most difficult. After everything we have been through, I still love him, believe in him, and want to rebuild our life with him.

*Id*. at 7.

A long sentence is thus unnecessary to achieve two of the most productive aims of federal sentencing: specific deterrence and rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(C), (D) ("The court, in determining the particular sentence to be imposed, shall consider— . . . the need for the sentence imposed . . . (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 674 (E.D.N.Y. 2011) (imposing five-year mandatory minimum, but finding it "excessive" and explaining that "a five-year sentence serves only to diminish his potential for rehabilitation.").

### B. Yehuda is an Israeli National With Few Connections to the United States: He Does Not Live Here, and the Crux of His Crime Was Not Committed Here, Reducing the Deterrence Value of A Long Custodial Sentence

Yehuda pled guilty to one count of possession of child pornography under 18 U.S.C. § 2252(a)(4)(B). Mr. Ringel's phone contained the charged materials when he sought to enter the United States while he was traveling from his home in Israel for a family trip on May 9, 2025. But any conduct allegedly obtaining or downloading the images that are the subject of the charge occurred abroad. However he came to possess these images, he did so outside the United States.

Indeed, Mr. Ringel has lived his entire life abroad. He is an Israeli national. His wife, children, and most of his siblings live in Israel. His business was in Israel. And the alleged conduct forming the basis for this case occurred in Israel—there are no allegations that Mr. Ringel received, downloaded, or even accessed child pornography in the United States, or while attempting to enter the United States at John F. Kennedy International Airport.

His arrest in the United States was little more than happenstance. Yehuda happened to travel to the United States with his family on May 9, 2025 to attend his brother's wedding. Mr. Ringel traveled here as a tourist. He has no immigration status in the United States. Before his arrest, he had never lived in the United States, he has traveled here only infrequently, and he will never again be permitted to enter the United States with this felony record. Both Mr. Rigel and the allegations against him are tenuously connected to the United States.[6]

[6] In *United States v. Yousef*, the Second Circuit discussed "the extent to which the Due Process Clause limits the United States' assertion of jurisdiction over criminal conduct committed outside our borders," emphasizing that due process requires "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis,* 905 F.2d 245, 248–49 (9th Cir. 1990)). Of course, Mr. Ringel pled guilty in this case, and accepts his responsibility for his criminal culpability. Nevertheless, the attenuated connection between the core of Mr. Ringel's conduct and the United States—he was here for a family wedding by

Because Mr. Ringel is a foreign national, with no immigration status in the United States, his stay here will be short-lived—limited to the duration of this case. His expeditious deportation is a veritable certainty, and he is unlikely to be permitted to return to the United States. Federal interest in this case against a foreign national, who allegedly possessed child pornography received abroad is thus minimal. There is neither a strong law enforcement interest in policing conduct of individuals who will remain abroad, nor a public safety and deterrence interest in the prosecution of a foreign national whose life is, and will continue to be, abroad.

Under the present immigration regime, Immigration and Customs Enforcement ("ICE") will almost certainly summarily deport him from the country as soon as his criminal case is complete. Mr. Ringel is unlikely to have an opportunity to ever return to the United States; he will never again be able to visit his brothers who live here. *See, e.g., United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *3 (E.D.N.Y. Sept. 24, 2014) ("While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation. The 'drastic measure' of deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes.") (quoting *Padilla v. Kentucky,* 559 U.S. 356, 360–64 (2010)).

Harsh criminal punishment is thus unnecessary. Yehuda's imminent deportation will, without more, accomplish the goals of deterrence, and protection of public safety. Because Mr. Ringel will not be present in the United States, his "deportation will provide an effective means of protecting the public from future wrongdoing . . . obviating the need for a lengthy and costly term

---

happenstance when his phone was opened at the border—remains an appropriate prudential consideration for the Court in crafting his sentence in federal court here.

of incarceration . . . . [T]he American public is generally safe from those who have been deported." *Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *8. As courts in this district have explained, this "diminished need to protect the American public from further crimes of the deported defendant argues in favor of shorter terms of incarceration." *Id.* at *9; *accord United States v. Fanfair*, 379 F. Supp. 3d 138, 141 (E.D.N.Y. 2019) (imposing a 5-month sentence where the Guidelines recommended 24-30 months, explaining "[s]pecific deterrence was considered . . . . Deportation will provide an effective means of protecting the public from future wrongdoing by the Defendant."); *United States v. Eiflaar*, 255 F. Supp. 3d 394, 398 (E.D.N.Y. 2017) (sentencing defendant to time served, as specific deterrence is "achieved by the sentence imposed" where the defendant "will be deported and will suffer the collateral consequences of a felony conviction . . . . It is highly unlikely that he will again violate the laws of the United States."). Because Yehuda has already served nearly five months in the harsh conditions of the MDC, further incarceration would be "greater than necessary" to accomplish the goals of federal sentencing.

### C. Comparable Cases Result In a Statutory Maximum Sentence of One Year in Mr. Ringel's Home Country; A Further Basis To Impose a Time-Served Sentence

Yehuda is an Israeli national who has lived his entire life in Israel. His plan and greatest hope are to go home to Israel. And he committed the essence of this crime while in his home in Israel—he may have possessed child pornography on his phone upon entering JFK, however he got it, though, was wholly accomplished in Israel.

Nonetheless, simply because he happened to travel to the United States for his brother's wedding in May 2025, Yehuda faces criminal sanction, not in his home in Israel, but here in the United States. And the criminal penalties here are far greater than those in Israel. The statute he pled to, 18 U.S.C. § 2252(a)(4)(B), criminalizing possession of child pornography, carries a

statutory maximum sentence of 20 years. *See* Plea Agr. ¶ 1. Yehuda's advisory Guidelines range under U.S.S.G. § 2G2.2 is 78 to 97 months' imprisonment. *See id.* ¶ 2.

But had his case been brought in Israel, the nexus of his life and of this case, Yehuda's criminal exposure would have been far less. Section 214(b3) of Israel's Penal Law provides for a statutory maximum sentence of one year imprisonment for possession of child pornography. *See* Israel Penal Law § 214(b3) (1977).[7] And Yehuda has already served nearly five months of hard time in some of the harshest conditions of incarceration at the MDC. The happenstance of his travel here, and the vast disparity between the sentencing exposure here and in Israel, where he has lived his whole life, and the essence of the crime occurred, is yet a further reason a time-served sentence is warranted here.

## VI. CONCLUSION

For the reasons stated above, Defendant Yehuda Ringel respectfully requests that this Court impose a time served sentence, which would be sufficient but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

Dated: September 1, 2026
New York, New York

Respectfully submitted,

MEISTER SEELIG & SCHUSTER PLLC

By: /s/

Ilana Haramati
125 Park Avenue, Suite 700
New York, New York 10017
ih@mss-pllc.com

*Counsel for Defendant Yehuda Ringel*

[7] Available at: https://www.nevo.co.il/law_html/law00/70301.htm.